**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

United States of America,

        Plaintiff,

vs.

Lennie Coleman Clark,

        Defendant.

CR 24-01669-TUC-JGZ (JR)

**REPORT AND RECOMMENDATION**

      This matter was referred to Magistrate Judge Rateau for pretrial matters. On June 12, 2024, Defendant filed a Motion to Suppress. Doc. 38. The Government filed the Government's Response to Defendant's Motion to Suppress. Doc. 39. Defendant did not reply. An evidentiary hearing was conducted on July 11, 2024. Doc. 42. Defendant was present and represented by counsel. The Government presented one witness, Border Patrol Agent (BPA) Dyllon Brown. Doc. 43. Twelve Government Exhibits were admitted. Doc. 44. The defense did not call any witnesses or present any exhibits.

. . .

. . .

1

Having considered the matter, the Magistrate Judge recommends that Defendant's Motion be denied.[1]

## I.    Facts

BPA Brown has been a Border Patrol Agent for 6 years and works at the Brian A. Terry Border Patrol Station.  His area of response is the 30 to 35 miles of international border from the Huachuca Mountains to State Route (SR) 80.  In some areas he patrols anywhere from a mile to three miles from the border.  He patrols the area daily.

State Route (SR) 92 falls within BPA Brown's response area.  It starts in Sierra Vista and runs from the Huachuca Mountains all the way to Bisbee where it meets up to SR 80.  SR 92 runs parallel to the border.  It is remote in some areas and there is a lot of brush up against the highway.  There are also may hills and areas for concealment.  According to BPA Brown, he commonly receives calls about undocumented non-citizens (UNCs) entering the country as well as UNC smuggling.  In the last 6 years, he has been a part of hundreds of such investigations.

In addition to having agents patrol the area, Border Patrol uses a remote video surveillance system.  Cameras are placed in common traffic trends where UNCs enter.  There is a lot of traffic coming across the border and the sensors go off all the time.  When they go off, they run through a system connected to the Tactical

---

[1] Trial is scheduled for August 6, 2024; the plea deadline is July 19, 2024.  Doc. 37.

2

Operations Center (TOC).  Using a radio system, a call is put out to the BPAs working the general grids and zones.

On February 8, 2024, at about 10:30 a.m., while on patrol duty, Agent Brown received information that one of the devices alerted that two UNCs were seen running north near SR 92 and Walkers Driveway.  No information was transmitted reference any cars seen near the sensor that was activated. Shortly after responding that he was headed to the location of the sensor alert, another BPA reported seeing a black sedan with out-of-state plates with a white sheet draped over the back seat travelling west from the area.  This information was received within five minutes of receiving the initial call that a device had been triggered. Mobile surveillance units did not report seeing any other cars leave the area.

While travelling east on SR 92, BPA Brown saw a vehicle matching the description coming towards him, a black sedan with California license plates. According to BPA Brown, seeing a car with an out-of-state plate is unusual for the area.  The black sedan turned right from SR 92 onto Palominas.  Agent Brown had to turn left from SR 92 onto Palominas in order to follow the black sedan.  The intersection of SR 92 and Palominas is about to three miles from the border.  Traffic was light.  There were two other cars that he had to pass in order to get behind the black sedan.  Neither of the two cars were black.  Neither had out-of-state license plates.

It took BPA Brown a couple of minutes to get behind the black sedan. While following the car, he saw a white sheet in the backseat but he did not see any

movement under the sheet.  While behind the sedan, BPA Brown called Tucson sector radio dispatch to run records on the car.  While waiting to hear back, BPA Brown noticed several handprints and fingerprints along the dusty trunk of the black sedan.  That's when he activated his lights and stopped the car.  Eventually he heard back from dispatch that the sedan was registered to a rental company.  By then however, he had already initiated the vehicle stop.  The stop occurred 10 to 15 minutes after the sensor was triggered.  The timing from when BPA Brown heard from TOC that the sensor had been triggered to when he made the vehicle stop seemed reasonable.

**II.     Law**

The Fourth Amendment protects a person against unreasonable searches and seizures. *United States v. Hensley*, 469 U.S. 221, 226 (1985). Consistent with the Fourth Amendment, police may stop persons in the absence of probable cause under limited circumstances. *Terry v. Ohio*, 392 U.S. 1, 88 (1968). The police may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity. *Hensley*, 469 U.S. at 226. Reasonable suspicion exists when an officer is aware of specific articulable facts, that, together with rational inferences drawn from them, reasonably warrant a suspicion that the person to be detained has committed or is about to commit a crime. *United States v. Cortez*, 449 U.S. 411, 416-18 (1981).

. . .

When assessing the reasonableness of the police officer's actions, the court must consider the totality of the circumstances which confronted the officer at the time of the stop. *United States v. Sokolow*, 490 U.S. 1, 8 (1989). This assessment precludes a "divide-and-conquer analysis" because even though each of a suspect's acts may be innocent in and of themselves, when taken together, they may warrant further investigation. *United States v. Arvizu*, 534 U.S. 266, 272 (2002). "A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct. *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013) (quoting *Arvizu*, 534 U.S. at 277).

The articulable facts forming the basis of a reasonable suspicion must be measured against an objective reasonableness standard, not by the subjective impressions of a particular officer. *Gonzalez-Rivera v. I.N.S.*, 22 F.3d 1441, 1445 (9th Cir. 1994). An officer is however, "entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *United States v. Brignoni-Ponce*, 422 U.S. 873, 885 (1975). But the inferences drawn from an officer's experience must be objectively reasonable. *United States v. Montero–Camargo*, 208 F.3d 1122, 1131 (9th Cir. 2000) (en banc). Reasonable suspicion can be based on the collective knowledge of officers even if not all information is communicated to the arresting officer. *Cf. United States v. Butler*, 74 F.3d 916, 921 (9th Cir. 1996) (discussing probable cause).

In relation to stops by Border Patrol agents, the totality of circumstances may include:

(1) characteristics of the area; (2) proximity to the border; (3) usual patterns of traffic and time of day; (4) previous alien or drug smuggling in the area; (5) behavior of the driver, including obvious attempts to evade officers; (6) appearance or behavior of passengers; (7) model and appearance of the vehicle; and (8) officer experience.

*United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007). "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[,] . . . [a]nd the facts must be filtered through the lens of the agents' training and experience." *United States v. Valdes-Vega*, 738 F.3d 1074, 1079 (9th Cir. 2013).

Guided by these factors the court must determine whether the facts cited by the Government in support of the present stop constitute behavior that would excite the suspicions of a trained BPA that criminal activity is afoot. *See United States v. Rodriquez*, 976 F.2d 592, 595 (9th Cir. 1992), *amended by United States v. Rodriquez*, 997 F.2d 1306 (9th Cir. 1993).

**Characteristics of the Area, Proximity to the Border and Previous Smuggling in the Area**

Law enforcement's awareness that a particular route or location is predominantly used for illegal purposes, including alien and drug smuggling, is strong support for a finding of reasonable suspicion. *United States v. Manzo-Jurado*, 457 F.3d 928, 936 (9th Cir. 2006); *see also Arvizu*, 534 U.S. at 269, 277 (finding it significant that officers found the defendant on an unpaved road used primarily by ranchers and forest service employees, but commonly used by smugglers to avoid a nearby border checkpoint).

Here, the area where the black sedan was travelling is anywhere from one to three miles from the international border.  Some parts are remote and there are hills and brush where people can conceal themselves. According to BPA Brown, it is common to receive calls about UNC smuggling in the area and in the last 6 years, he has investigated hundreds of such cases.  In terms of raising suspicion of smuggling and transporting UNCs, these facts merit significant weight in the calculus of reasonable suspicion.

**Patterns of Traffic and Time of Day**

The totality of the circumstances analysis includes a consideration of the modes or patterns of operation of certain kinds of law-breakers. *Berber-Tinoco*, 510 F.3d at 1088.

Here, the stop occurred at 10:45 a.m., hardly a time of day that alone would raise suspicion.  BPA Brown did note however, that the stop was initiated 10 to 15 minutes after the sensor was triggered. The timing from when the sensor was triggered to when BPA Brown made the vehicle stop seemed to add up.  This factor weighs in the Government's favor.

**Behavior and Appearance of the Driver**

No identifying features of the driver or passengers were noted by BPA Brown. Nor did the agent take note of any unusual driving behavior such as speeding, swerving, or driving evasively.  This factor does not weigh in the Government's favor.

. . .

**Characteristics of the Vehicle**

Because of BPA Brown's familiarity with the 30 plus miles of international border near the Huachuca Mountains, he knew that SR 92 runs parallel to the border and is anywhere from one to three miles from the border.  Because of his experience working at the Brian A. Terry Border Patrol Station, he also knew that remote video cameras were strategically placed in areas commonly used by UNCs to enter the country illegally.

At 10:30 a.m., on February 8, 2024, BPA Brown learned that one of the devices had in fact alerted.  The camera showed two UNCs running north near SR 92.  No cars were seen near the sensor that was activated but agents saw a black sedan with out-of-state plates with a white sheet draped over the back travelling west from the area.  Mobile surveillance units did not report seeing any other cars leave the area.

While on route to the area, BPA Brown saw a black sedan with California license plates travelling on SR 92.  His experience told him that cars with out-of-state license plates are not usually seen in that area.  Believing the sedan might be the same one seen by fellow officers, he turned onto the intersection of SR 92 and Palominas.  Traffic was light and there were only two other cars in the area.  Neither was black and neither had out-of-state plates.  After passing both cars and getting directly behind the sedan, he noticed the white sheet in the back seat that fellow agents had referenced.  While the sheet was not moving so as to indicate it was covering people, it still raised suspicions.  BPA Brown decided to take further action

8

so he called in the license plate but before hearing back, he noticed another detail-- there were handprints and fingerprints along the dusty trunk of the sedan.  Given his 6-year experience as a BPA and having investigated hundreds of UNC smuggling events along that particular area of the border, he had reason to believe the sedan was involved in smuggling and transporting UNCs.  These factors weigh heavily in the Government's favor.

**Totality of Circumstances**

Giving due weight to each of the above factors and considering them in the totality and collective experience of BPA Brown and his fellow officers, this Court finds that BPA Brown had reasonable suspicion to believe that Defendant was engaged in illegal activity. The stop comported with the Fourth Amendment.

**III.    Recommendation for Disposition by the District Judge**

Based on the foregoing and pursuant to 28 U.S.C. § 636(b) and Local Rule Civil 72.1, Rules of Practice of the United States District Court, District of Arizona, the Magistrate Judge recommends that the District Court, after an independent review of the record, **DENY** Defendant's Motion to Suppress.  Doc. 38.

This Report and Recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the District Court's judgment in the case.

Pursuant to 28 U.S.C. §636(b)(1)(B), the parties have fourteen (14) days from

the date of this Report and Recommendation to file written objections to these findings and recommendations with the District Court. Any objections and responses to objections filed should be filed as **CR 24-01669-TUC-JGZ**.  No replies shall be filed unless leave is granted from the District Court.

Dated this 19th day of July, 2024.

_____
Honorable Jacqueline M. Rateau
United States Magistrate Judge

10